Filed 7/14/15  In re Jeremiah J. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JEREMIAH J., a Person Coming Under the Juvenile Court Law. | B258391 (Los Angeles County Super. Ct. No. CK99700) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANDRES C., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica Paulson-Duffy, Deputy County Counsel, for Plaintiff and Respondent.

_____

Andres C. (father) appeals from the juvenile court's jurisdictional and dispositional orders pertaining to his son Jeremiah J. (Jeremiah, born Nov. 2009). Father contends there was insufficient evidence that he sexually abused Jeremiah's older half-sister or that Jeremiah was at risk of similar harm, and that the court erred in not returning Jeremiah to father. We disagree and affirm the court's orders.

## FACTUAL AND PROCEDURAL HISTORY

On May 8, 2013, the Los Angeles County Department of Children and Family Services (DCFS) received a referral that Jeremiah's mother, A.J. (mother), had burned him above his right eyelid with a cigarette lighter, continued to drink, and lacked stable housing. This referral followed 15 prior referrals of abuse and neglect by mother against Jeremiah and his two older half-sisters, Jazmyn H. (Jazmyn, born Mar. 2005) and Jordyn S. (Jordyn, born Sept. 2006).[1]

**Allegations of Sexual Abuse**

*Social Worker's Interview of Jazmyn*

In interviews of the children immediately following the referral, allegations of sexual abuse by father surfaced. When the emergency response social worker asked eight-year-old Jazmyn if father was nice, she said he had "SEX" with her, writing the word on paper. She told the social worker that while mother was at the hospital with Jeremiah, father was caring for her and Jordyn. Father told her to go into his room, take off all her clothes, and lie down on the bed. Father took off all his clothes and got on top of her. He "went up and down" on her. When asked if he put anything in her private parts, she stated, "it starts with D and ends in K," confirming she meant dick, which was a penis. Jazmyn responded affirmatively to the social worker's questions of whether he "put it in your vagina," and whether it hurt. She denied bleeding or that there was any "sticky stuff" on her. Father got off her quickly and told her to put clothes on when they heard Jordyn say "mommy's home." Jazmyn said father told her not to tell mother.

---

[1] All three children have different fathers. Although the juvenile court sustained allegations against Jordyn's father, they are not relevant here. Neither mother nor her daughter's fathers are parties to this appeal.

When mother asked Jazmyn what she and father were doing in the room, Jazmyn told mother she and father were talking. Jazmyn reported that she did not tell mother what happened until recently when she saw a picture and told mother, "I know what that is, it is a dick." Mother asked how she knew this, and Jazmyn told mother about father going up and down on her.

The social worker noted Jazmyn was "nonchalant" and reminded Jazmyn that she had promised to tell the truth. The social worker told Jazmyn that what she was saying was very important, that it was against the law for adults to have sex with children, and that it was "very very important that she tell the truth." Jazmyn said she was telling the truth.

**Dependency Investigator's Interviews**

*Jazmyn's Interview*

When Jazmyn was interviewed three months later in June 2013 by a DCFS dependency investigator, she agreed to tell the truth. In response to the inquiry if anyone had touched her private parts, Jazmyn stated, "my old dad did something nasty to me." She confirmed that her "old dad" was father. She then stated "I know it's against the law." She went on to state that father "did nasty something. He got naked. My mom was at the hospital getting Jeremiah out of her belly." When asked what father did after getting naked, Jazmyn wrote "SEX" on a paper. The dependency investigator asked Jazmyn to explain sex, and Jazmyn stated, "I thought I was going to have a baby." Jazmyn then explained, "He told me to take off my clothes and go on the bed. [Father] closed the door and locked it. He took off his clothes." Jazmyn described father's penis as "[b]ig and hairy" and pointing down. She continued, "He goes on top of me. He put his penis on top of me, then he went up and down, up and down." She pointed to her vagina when the dependency investigator asked where he put his penis. Jazmyn stated that his penis did not go inside her vagina, but was "on top." Jordyn knocked on the door and told them mother was home. Jazmyn said she told mother that father needed to be in jail "when he wasn't [her] daddy anymore."

3

Jazmyn then spontaneously told the dependency investigator, "I didn't like the milk he gave me . . . [w]hen he was done, he said drink some milk. Then he squirted it in my mouth. There was a lot in there. . . . A lot came out. Only a little in my mouth." She clarified the milk came from father's penis and he said to drink it. She reported that it tasted "[l]ike rotten milk. I had to pretend I liked it and, he said keep it a secret." Afterwards, father told her to get dressed. She went downstairs where mother was with Jeremiah and talked about the new baby's name, which she did not like. She denied father touched her private parts on more than one occasion, and denied he touched her siblings.

### Mother's Interview

The dependency investigator also interviewed mother regarding the sexual abuse allegations. Mother believed the abuse occurred in 2009, when Jazmyn was four years old, because Jazmyn had told mother where they lived and what car mother was driving at the time. Mother reported that a few years ago, she was talking to her friend about nuts, and Jazmyn started laughing, saying that father had showed her his nuts and "touched her pee pee." Jazmyn explained to mother that father had told her to lay on the bed and take off her clothes, and told Jordyn to sit on the couch. Jazmyn said father got on top of her, and "went up and down." She told mother he got off of her because Jordyn said mother was home. Mother stated, "I don't think penetration happened," because Jazmyn said it did not hurt. Mother believed this occurred while she was working at the hospital and father was the primary caregiver of the children.

Mother added that in March 2010, her friend's child disclosed having her vagina touched by father and the police were called. Father disappeared and mother filed a missing persons report. She believed father ran away because he was guilty. After the incident was reported, on March 15, 2010, mother took her children for a physical examination. She was told there were no signs of physical abuse, and showed the dependency investigator the letter from the physician so indicating. Mother stated she had not left the girls alone with father since the allegation by her friend's daughter in March 2010. Father had moved out of the home and she did not have regular contact

4

with him. She had been allowing Jeremiah to visit father and spend the weekend with him, but had stopped all visitation after Jazmyn's disclosure of the sexual abuse in January 2013.

Mother reported that she had noticed Jeremiah acting out sexually after visiting father. When she asked father about this, he told mother that Jeremiah had come into the room when father was "watching a porno." When mother asked if he turned it off, father said, "No, he's my son."

### Father's Interview

Father was also interviewed by the dependency investigator in June 2013. He denied any sexual abuse and stated that law enforcement had "investigated these same allegations a couple of years ago and nothing came of it." At the time of the investigation he cooperated, the kids were fine, and there was no evidence he did anything. He had not been contacted by law enforcement regarding the current investigation, which he learned about from mother three months ago. He wanted Jazmyn's allegations to be investigated so that he could be cleared and could see his son. Mother had not allowed him to visit Jeremiah since the allegations came to light.

When the dependency investigator told father that Jazmyn's statements were very consistent and detailed and would be extremely difficult for an eight-year-old child to make up, father began to cry and said that it was hurtful for something like that to be said about him. He believed Jazmyn made up the story because she was mad he was no longer living with her.

Father admitted that Jeremiah had seen a pornographic video while in his care, stating that Jeremiah had gotten out of bed when he was not supposed to. Father did not turn off the video because he put Jeremiah back to bed. Father also said Jeremiah had gotten up in the middle of the night and saw father and his girlfriend engaged in sexual activity.

**The Petitions**

DCFS filed three petitions on behalf of Jeremiah, Jazmyn and Jordyn: An original petition in May 2013; a first amended petition in August 2013; and a second amended

petition in June 2014. Under Welfare and Institutions Code section 300, subdivisions (b), (d), and (j),[2] the operative second amended petition alleged: "On a prior occasion, . . . father of the child Jeremiah, sexually abused the child Jazmyn by forcibly raping the child by placing the . . . father's penis in the child's vagina, causing the child pain. Such sexual abuse of the child by the . . . father endangers the child's physical health and safety and places the child and the child's siblings, Jordyn and Jeremiah, at risk of physical harm, damage, danger, sexual abuse and failure to protect." The petition also alleged that mother was under the influence of alcohol while the children were in her care, placing them at risk.

**Jurisdiction and Disposition Hearing on Second Amended Petition**

The juvenile court held the contested jurisdiction and disposition hearing on the second amended petition on June 26, 2014. DCFS entered several documents into evidence, including a June 24, 2014 supplemental report, indicating that Jeremiah was doing well in his foster placement and that his foster parent was willing to adopt him; that father had recently been released from jail after serving time for burglary; and that mother had refused to disclose the whereabouts of Jeremiah after a visit and Jazmyn revealed his location to the social worker after mother had told her to keep it a secret.

Mother pled no contest to the only count against her, alleging her alcohol use.

Father testified that he had lived with mother and Jazmyn from 2007 through 2010. On the day of Jeremiah's birth, he went to the hospital with mother and stayed there with her until she was discharged two days later. He stated there were occasions when he was left alone with Jazmyn and provided care such as feeding and supervision. His last visit with Jeremiah was on January 14, 2014, and he had not been allowed any visits since then due to a restraining order mother had obtained from the family court.

The juvenile court sustained the sexual abuse allegations against father under section 300, subdivisions (b), (d), and (j). The court found that Jazmyn's statements regarding the abuse had been "consistent," and "[t]he abuse certainly is to the extent that

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

6

case law and common sense would indicate that other children would be affected by it or would be substantially at risk with respect to the behavior . . . ."

As to disposition, the juvenile court found by clear and convincing evidence, pursuant to section 361, subdivision (c), that there was a substantial danger if Jeremiah remained with his parents and ordered that he remain suitably placed. The court granted father and mother family reunification services, and granted father monitored visitation three times a week for three hours at a time, giving DCFS discretion to liberalize. The court ordered father to participate in a parenting program and a sexual abuse for perpetrators program.

Father filed this appeal.

## DISCUSSION

### I. Jurisdictional Finding that Father Sexually Abused Jazmyn

Father contends there was insufficient evidence to sustain the juvenile court's jurisdictional finding that he sexually abused Jazmyn. We disagree.

#### A. *Standard of Review and Applicable Law*

In reviewing a challenge to the sufficiency of the evidence, we determine whether the record as a whole contains any substantial evidence to support the juvenile court's conclusion. (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393–1394.) In doing so, "we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding." (*In re James R*. (2009) 176 Cal.App.4th 129, 135.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S*. (1988) 201 Cal.App.3d 315, 321.)

A child comes within the jurisdiction of the juvenile court under subdivision (b)(1) of section 300 if, in part, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

A child comes within the jurisdiction of the juvenile court under subdivision (d) of section 300 if, in part, "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household."[3]

A child comes within the jurisdiction of the juvenile court under subdivision (j) of section 300 if: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

### B. Substantial Evidence

Substantial evidence supports the juvenile court's jurisdictional finding that father sexually abused Jazmyn. Three separate times, eight-year-old Jazmyn provided

---

[3] Penal Code section 11165.1 defines "sexual abuse" as "sexual assault or sexual exploitation as defined by the following:

"(a) 'Sexual assault' means conduct in violation of one or more of the following sections: Section 261 (rape), subdivision (d) of Section 261.5 (statutory rape), 264.1 (rape in concert), 285 (incest), 286 (sodomy), subdivision (a) or (b), or paragraph (1) of subdivision (c) of Section 288 (lewd or lascivious acts upon a child), 288a (oral copulation), 289 (sexual penetration), or 647.6 (child molestation).

"(b) Conduct described as 'sexual assault' includes, but is not limited to, all of the following:

"(1) Penetration, however slight, of the vagina or anal opening of one person by the penis of another person, whether or not there is the emission of semen.

"(2) Sexual contact between the genitals or anal opening of one person and the mouth or tongue of another person.

"(3) Intrusion by one person into the genitals or anal opening of another person, . . .

"(4) The intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification, . . .

"(5) The intentional masturbation of the perpetrator's genitals in the presence of a child." (Pen. Code, § 1165.1, subds. (a) & (b).)

remarkably consistent descriptions of the sexual abuse—to the emergency response social worker, to the dependency investigator, and to mother. Each time, she described the following: Father told her to go to his room and take off her clothes while Jordyn stayed on the couch; father took his clothes off, got on top of her, and "went up and down" on her private parts; she saw his penis; and father only stopped and told her to get dressed when Jordyn announced that mother had come home with Jeremiah. Each time Jazmyn also gave the same date of occurrence—when mother was at the hospital giving birth to Jeremiah.

Father argues that Jazmyn's statements were inconsistent because in her first interview she described an act of rape, while in her second interview she described an act of oral copulation and denied rape. Father takes issue with the second amended petition's description of the sexual abuse as rape. But sexual abuse under the Penal Code includes both rape and oral copulation, as well as father's other conduct with Jazmyn.

Moreover, there was no reason for Jazmyn to lie or exaggerate about being sexually abused by father. She spontaneously told mother about the abuse. She did not report more than one instance of sexual abuse, and she denied that father abused her siblings. The graphic descriptions of the sexual abuse given by an eight-year-old indicate personal experience.

Father's three additional arguments challenging the juvenile court's finding are unpersuasive. First, father's argument that "[t]here was no indicia of reliability" focuses primarily on allegations of sexual abuse by father against a friend's daughter and allegations of sexual abuse of Jazmyn by her own father. Father asserts that Jazmyn never made any disclosures of sexual abuse against him while these other allegations were being investigated. But father points to nothing in the record showing that Jazmyn was ever asked about father or anyone else abusing her.

Second, father argues "[t]here [is] reason to suspect bias and coaching of Jazmyn by Mother." Father points out that mother obtained a permanent restraining order against him on January 15, 2014, from a family court, despite the juvenile court having jurisdiction over Jeremiah. According to father, this shows that mother's "powers of

9

influence and persuasion were notable and not to be discounted as the underlying force which propagated the sexual allegations leveled against Father." But father never alleged below that he believed mother may have coached Jazmyn; instead, his explanation was that Jazmyn may be fabricating the allegations because she was mad father no longer lived with her. Jazmyn promised multiple times to tell the truth in her statements to the social worker and dependency investigator. As DCFS points out, in the only hint of "coaching" in the entire record, Jazmyn reported to the social worker that mother told her not to disclose the whereabouts of Jeremiah, yet Jazmyn immediately revealed his location to the social worker. We agree with DCFS that "[t]his attempt by Mother to get Jazmyn to withhold information was a dismal failure, and contradicts the idea that Mother could have collaborated with eight-year-old Jazmyn to tell such a detailed, specific story about sexual abuse."

Finally, father argues "[t]here was no medical corroboration of any rape." But father cites no authority indicating that medical corroboration is a necessary prerequisite for a finding of sexual abuse. Indeed, such corroboration is unnecessary. (See *In re Lucero L.* (2000) 22 Cal.4th 1227, 1249–1250.)

## II.  Jurisdictional Finding that Jeremiah was at Risk of Harm

Father next contends that even assuming jurisdiction over Jazmyn can be supported, "[n]othing in the record suggests or supports that Father has or would have any sexual interest in his son, as necessary to sustain the j-1 allegation." We disagree.

The record shows that father sexually abused Jazmyn in the family home when she was under his care and supervision at a time when Jordyn was also at home under his care and supervision. Jazmyn did not report the abuse to mother until father was no longer her "daddy." Father not only abandoned and betrayed the parental role, but his aberrant behavior was so brazen that it put any child under his care and supervision at risk of harm. Moreover, father abused Jazmyn when she was four years old, the same age as Jeremiah at the time the first amended petition was filed. Under these circumstances, the juvenile court properly asserted jurisdiction over Jeremiah.

Father's reliance on our Supreme Court's recent case, *In re I.J.* (2013) 56 Cal.4th 766, affirming jurisdiction over siblings of both genders when sexual abuse occurs, is misplaced. He argues that unlike that case, he did not engage in sustained abuse and Jazmyn was not his biological daughter. But that is of no matter here. Father's sexual abuse of four-year-old Jazmyn was serious, aberrant and shocking. Where the sexual abuse of a child becomes more serious, "it becomes more necessary to protect the [siblings] from even a relatively low probability of that abuse." (*Id*. at p. 778.) "The juvenile court need not compare relative risks to assume jurisdiction over all the children of a sexual abuser, especially when the abuse was as severe and prolonged as here." (*Id*. at p. 780.) "'Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial.'" (*Id*. at p. 780, quoting *In re Karen R.* (2001) 95 Cal.App.4th 84, 91.)

## III. Removal Order

Father contends the juvenile court erred in not returning Jeremiah to his custody and failed to make the necessary detriment finding under section 361.2, subdivision (a).

Father argues that because he was the noncustodial parent at the time the petitions were filed, the juvenile court should have considered placing Jeremiah with him unless the court first made the detriment finding under section 361.2, subdivision (a). He argues that the court erred by instead making its order under section 361, subdivision (c).

Under section 361.2, subdivision (a), "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) The detriment finding must be made by clear and convincing evidence and is reviewed on appeal for substantial evidence. (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461.)

11

Under section 361, subdivision (c), "A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] . . . There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home." (§ 361, subd. (c)(1).)

The juvenile court heard and rejected father's request for custody. In making its dispositional order, the court found "by clear and convincing evidence, pursuant to Welfare and Institutions Code section 361[, subdivision] (c), that there is a substantial danger if the children were returned home to the physical health, safety, and protection, or physical or emotional well-being of the children."

As DCFS observes, even if the juvenile court applied the wrong statute, any error was harmless. The court found by clear and convincing evidence that father's physical custody presented a substantial danger to Jeremiah' physical health, safety, protection, physical or emotional well being. There is no substantive difference between that finding and a finding under section 361.2, subdivision (a), that placement with father "would be detrimental to the safety, protection, or physical or emotional well-being of the child." As the court's findings are supported by substantial evidence of father's sexual abuse, it is not reasonably probable that father would have obtained a more favorable result had the juvenile court expressly made its dispositional finding under section 361.2, subdivision (a) instead of section 361, subdivision (c). Under such circumstances, reversal is unwarranted. (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 302–304.)

## IV. Dispositional Order

Father also contends the juvenile court abused its discretion in ordering him to participate in sex abuse counseling and by maintaining his visitation as monitored. He argues that because there was no substantial evidence to support the jurisdictional finding that he sexually abused Jazmyn, the dispositional orders are not appropriate.

12

Because we have found that substantial evidence supports the juvenile court's jurisdictional finding, father's argument is without merit.  Moreover, in fashioning dispositional orders, "the trial court has broad discretion to make virtually any order deemed necessary for the well-being of the child . . . ." (*In re Sergio C.* (1999) 70 Cal.App.4th 957, 960; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006–1008.) The court's orders were tailored to protect Jeremiah.  Indeed, the court could have ordered even more substantial requirements in light of father's serious conduct, but was willing to order that father be granted reunification services.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
          ASHMANN-GERST


We concur:


_____, J.
          CHAVEZ


_____, J.
          HOFFSTADT


13